**O'CONNOR BERMAN DOTTS & BANES**
**Second Floor, Nauru Building**
**1 Nauru Loop**
**Susupe, Saipan, CNMI**
**Mail: PO Box 50-1969 Saipan MP 96950**
**Phone: 234-5684**
**Fax: 234-5683**
**E-mail: attorneys@pacific-lawyers.com**

**Attorneys for Defendant Tang Xiaoying**

**IN THE DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**TANG XIAOYING**<br>**(f/k/a Xiaoying Tang Dowai),**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Crim. No. 13-00014-01**<br><br><br>**MOTION TO DISMISS** |

Defendant Tang Xiaoying hereby moves the Court to dismiss the Indictment in this matter. In support of this motion, Defendant shows the Court the following:

## I. UNCONSTITUTIONAL VENUE

The judicial power of the United States is properly exercised by courts established pursuant to Article III of the United States constitution, which secures judicial independence by requiring judges be tenured for life, and be paid salaries that cannot be reduced by Congress.[1] This court is not established pursuant to Article III of the Constitution, and the judge of this court

[1] *See* U.S. CONSTITUTION, Art. III, Sec. 1.

is not tenured for life, but rather for a term of years.[2] Therefore, unless an exception applies, the trial of Ms. Tang for these offenses in this court in unconstitutional.

An exception exists for courts which are: a) established pursuant to a constitutional grant of power, other than Article III, which is broad enough to encompass the establishment of courts; and b) established under circumstances where, due to the remoteness of the place where the court is to be established and the temporary character of the court to be established there, the establishment of an Article III court would be impractical. Historically, this includes courts established in the territories of the United States and in foreign countries.[3] However, the exception does not apply where the requisite circumstances do not exist.[4]

The requisite circumstances do not exist in the CNMI. The CNMI is not so remote, and its relation to the United States is not so impermanent, that an exception to the requirements of Article III is justified.[5] This is true regardless of whether this court is considered a "territorial

---

[2] *See* 48 U.S.C. § 1821(b)(1). *See also* Nguyen v. United States, 539 U.S. 69 (2003) (judge of this Court, as a non-Article III judge, not eligible to sit on panel of Court of Appeals).

[3] *See generally* American Insurance Co. v. Canter, 26 U.S. 511 (1828) (territorial court in Florida); In Re Ross, 140 U.S. 453 (1891) (consular court in Japan). Another historic exception exists for courts exercising the delegated legislative function of adjudicating public rights. *See generally* Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272 (1856).

[4] *See generally* Glidden Co. v. Zdanok, 370 U.S. 530, 548 (1962) ("When the peculiar reasons justifying investiture of judges with limited tenure have not been present, the Canter holding has not been deemed controlling."). *See, e.g.*, Reid v. Covert, 354 U.S. 1 (1957) (treaty court); O'Donoghue v. United States, 289 U.S. 516 (1933) (District of Columbia court).

[5] The relation of the CNMI to the United States is permanent. *See* COVENANT § 105 (requiring mutual consent to change any fundamental provision, including the political relationship itself). The ability of this Court to effectively exercise the regular full jurisdiction and powers of a district court is amply demonstrated by the fact that it does so.

court," as it has sometimes been described in dicta,[6] or a "treaty court," which it actually is.[7] The rationale for the exception, being identical in both instances, does not admit of any principled constitutional distinction between the two.[8] Therefore, the exception does not apply to this court, and the trial of Ms. Tang for these offenses in this court is unconstitutional.

## II. UNCONSTITUTIONAL CHARGES

The offenses of which Ms. Tang is charged are all premised on the "sham marriage" doctrine, which is stated as follows at the outset of the Indictment:

> Under the immigration laws of the United States, a foreign-born national married to a U.S. citizen could obtain legal permanent resident status based on that marriage, provided the marriage had been entered into in good faith, intending to establish a life together, and not only for the purpose of enabling the foreign-born national to obtain legal permanent resident status in the United States.

---

6 *See, e.g.*, Nguyen v. United States, 539 U.S. 69, 72-73 (2003); Armstrong v. Northern Mariana Islands, 576 F.3d 950, 952 (9th Cir. 2009).

7 *See, e.g.*, Sablan Construction Co. v. Government of Trust Territory of the Pacific Islands, 526 F.Supp. 135, 139 (D.N.M.I. App. Div. 1981) (congressional authority to establish District Court "flows from Articles 3 and 12 of the Trusteeship Agreement"). The Trusteeship Agreement was a treaty. Temengil v. Trust Territory of the Pacific Islands, 881 F.2d 647, 652 (9th Cir. 1989); In re Rothstein, 884 F.2d 490, 492 (9th Cir. 1989). Indeed, this Court cannot be a territorial court, because at the time of its establishment in 1977, the NMI was part of the Trust Territory, to which territorial powers did not extend. *See, e.g.*, Morgan Guaranty Trust Co. v. Republic of Palau, 924 F.2d 1237, 1244 (2nd Cir. 1991); Juda v. United States, 6 Cl. Ct. 441, 456 (1984); Sablan v. Tenorio, 4 N.M.I. 351, 361 n.43 (1996). On the contrary, the "entire authority of the United States in the Trust Territory" derived from the Trusteeship Agreement. Gale v. Andrus, 643 F.2d 826, 830 (D.C.Cir. 1980).

8 *See, e.g.*, Commodity Futures Trading Commission v. Schor, 478 U.S. 833, 857 (1986)("[B]right-line rules cannot effectively be employed to yield broad principles applicable in all Article III inquiries . . . due regard must be given in each case to the unique aspects of the congressional plan at issue and its practical consequences in light of the larger concerns that underlie Article III."); Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 586 (1985) ("Practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III."). *See generally* Boumediene v. Bush, 553 U.S. 723, 764 (2008) (holding that questions of the extraterritorial application of Constitutional norms "turn on objective factors and practical concerns, not formalism").

Indictment (ECF No. 4) at 1 (Count I ¶ 1(a)). But for this premise, none of the misrepresentations attributed to Ms. Tang in this case would have been material to her green card application.[9] The premise is constitutionally faulty, thus so is the Indictment.

The "sham marriage" doctrine as set forth in the Indictment, requiring the intent to "establish a life together," derives from Bark v. INS, 511 F.2d 1200 (9th Cir. 1975), and ultimately from Lutwak v. United States, 344 U.S. 604 (1953). It is an application, in the context of marriage, of the broader "sham transaction" doctrine, which derives from federal tax law, and holds that the substance, rather then the form, of a transaction is legally controlling.[10] On the one hand, Bark teaches that the law cannot constitutionally require, as a condition of eligibility for residency, the traits of a stereotypically conventional marriage:

> The concept of establishing a life as marital partners contains no federal dictate about the kind of life that the partners may choose to lead. Any attempt to regulate their life styles, such as prescribing the amount of time they must spend together, or designating the manner in which either partner elects to spend his or her time, in the guise of specifying the requirements of a bona fide marriage would raise serious constitutional questions. Aliens cannot be required to have more conventional or successful marriages than citizens.

Bark, *supra*, 511 F.2d at 1201-02 (citations omitted).[11] Sexually speaking, therefore, "a life together" must therefore be broad enough to encompass celibate marriage, open marriage, and

---

[9] *See generally id*. at 4 (Count II) ("a material fact"); *id*. at 4 (Count III) ("materially false"); *id*. at 5 (Count IV) ("materially false").

[10] *See, e.g.*, Brown v. Continental Airlines, Inc., 647 F.3d 221, 227-28 (5th Cir. 2011); Minish v. Huey, 482 F.2d 500, 505 (6th Cir. 1973); Matter of Aldecoaotalora, 18 I. & N. Dec. 430, 431-32 (B.I.A. 1983).

[11] The court cited Roe v. Wade, 410 U.S. 113 (1973); Graham v. Richardson, 403 U.S. 365 (1971); and Griswold v. Connecticut, 381 U.S. 479 (1965), indicating that the constitutional questions raised would relate to the right of equal protection of the laws for aliens, discussed in Graham, as well as the fundamental due process right of marital privacy recognized in Griswold

everything in between. Financially, it must encompass financial dependence, independence, or interdependence; residentially, a common bed, separate beds, separate bedrooms, or separate houses; emotionally, love, like, or loathing. At the same time, however, Bark also teaches, at least by implication, that a valid civil marriage alone is not sufficient, even though to enter into a legal marriage is, in fact, to establish a life together, in that the parties assume certain mutual rights and obligations relative to one another that would not exist but for the marriage. The question of how much more than a valid civil marriage is required is left unstated and unclear. It is therefore left to the parties to guess at, and to immigration bureaucrats to decide, based on investigations of the parties' lives that can only be intrusive of their marital privacy rights. Thus Bark, in the end, does not avoid the constitutional problems it sought to avoid. By accepting that the law can properly require a marriage to be, and to be treated by its parties as, anything more than the sum of its legal incidents, Bark trenches on the constitutional rights it sought to uphold, by positing some kind of normative "true" marriage distinct from a legally valid one, by necessitating intrusive investigation to determine if such a marriage exists, and by defining that marriage in a manner that is impossible to understand clearly or apply consistently.[12]

Bark would therefore need to be overruled – except that it already has been. Neither Bark nor Lutwak can survive United States v. Windsor, 133 S.Ct. 2675 (2013), which recently

---

and its progeny. *See also, e.g.*, Zablocki v. Redhail, 434 U.S. 374, 384-86 (1978) (recognizing "the decision to marry" as part of the fundamental right of marriage).

[12] The meaning of "a life together," in other words, is so obscure that persons of ordinary understanding must necessarily guess at its meaning. *See generally* Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). The fact that this vague standard is being applied to the conduct of people who are, by definition, from foreign cultural backgrounds only highlights the problem.

struck down the Defense of Marriage Act (DOMA), a federal law defining the terms "marriage" and "spouse," for all federal purposes, as requiring that the parties to the marriage be a man and a woman. Windsor held, in light of the fact that marriage is a matter historically defined by the states, *see id*. at 2691-92, that a federal marriage-defining law with the purpose and effect of "impos[ing] a disadvantage, a separate status" on those entering into marriages of a particular disfavored type, even if the marriage is valid under state law, *see id.* at 2693, has "no legitimate purpose" and constitutes a "deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution." *See id*. at 2695-96. The "sham marriage" doctrine (or, in other words, the application of the "sham transaction" doctrine to marriage), whether in the immigration context or any other, has this purpose and effect, and is thus invalid for the same reasons as DOMA.[13] Particularly in light of Windsor, the only constitutional rule is that of the dissenting justices in Lutwak: to wit: "If the parties are validly married, even though the marriage is a sordid one, we should suppose that would end the case." Lutwak, *supra*, 344 U.S. at 621.

## CONCLUSION

[13] Windsor attempts to distinguish the "sham marriage" doctrine in the immigration laws from DOMA on the basis that the latter had a "far greater reach," *see id*. at 2690, but in fact the reach of the doctrine is equally great, because, if the marriage is found to be a "sham transaction" in the immigration context, it can be extended to invalidate the lawful effect of the marriage in other federal contexts as well, such as in the evidentiary law. *See, e.g.*, Lutwak, *supra*, 33 U.S. at 614-15 (denying marital privilege to parties in "sham" marriage); United States v. Saniti, 604 F.2d 603, 604 (9th Cir. 1979) ("[T]here is a narrow exception to the husband-wife privilege when the marriage was not entered into in good faith."). *Cf.* Brown, *supra*, at 647 F.3d at 227 (noting that "sham divorces" can be disregarded in tax and bankruptcy law as well as immigration). Furthermore, it would be meaningless to an alien even if the doctrine were "limited" to the immigration law, since, without immigration status, the alien has no practical access to any other rights or benefits that may attach to the marriage under either US or state law. The alien would effectively be told, "You can eat anything you want at the buffet; you just can't come in the door."

For the foregoing reasons, the indictment of Ms. Tang must be dismissed.

Respectfully submitted this 9th day of December, 2013.

O'CONNOR BERMAN DOTTS & BANES
Attorneys for Defendant Tang

by:_______/s/__________________________
Joseph E. Horey

*7516-01-131206-PL-M to dismiss*