**O'CONNOR BERMAN DOTTS & BANES**
**Second Floor, Nauru Building**
**1 Nauru Loop**
**Susupe, Saipan, CNMI**
**Mail: PO Box 50-1969 Saipan MP 96950**
**Phone: 234-5684**
**Fax: 234-5683**
**E-mail: attorneys@pacific-lawyers.com**

**Attorneys for Defendant Tang Xiaoying**

**IN THE DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**TANG XIAOYING**<br>**(f/k/a Xiaoying Tang Dowai),**<br><br>**Defendant.** | **Crim. No. 13-00014-01**<br><br>**REPLY**<br>**IN SUPPORT OF**<br>**MOTION TO DISMISS**<br><br>**Date: January 7, 2014**<br>**Time: 9:00 am** |

## INTRODUCTION

Defendant Tang replies as follows to the points and authorities raised by the Government in its Opposition.

## I. UNCONSTITUTIONAL VENUE

Defendant Tang argued in her motion that this Court cannot constitutionally exercise judicial power over her, as it is not vested with the institutional protections of its independence required by Article III of the Constitution. *See generally* Motion to Dismiss (ECF No. 21) at 1-3. The Government's sole response is to cite United States v. Sun Wei Qin, 399 Fed. Appx. 319 (9th Cir. 2010), in which the same argument was rejected by the Ninth Circuit. *See* Opposition (ECF

No. 25) at 1. The clear implication is that Sun settles the issue once and for all, so conclusively that there is no need even to argue the point.

Such is not the case. Sun was an unpublished decision, and "[u]npublished dispositions and orders of [the Ninth Circuit] are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion." Ninth Circuit Rule 36-3(a). A non-precedential decision does not bind this Court. *See, e.g.*, Hart v. Massanari, 266 F.3d 1155, 1159 fn.2 (9th Cir. 2001) (noting that "later panels of the court [of appeals], as well as lower courts within the circuit" are free "to disregard earlier rulings that are designated as nonprecedential"). The Ninth Circuit obviously knew this at the time it elected not to publish its decision. It also must have known, from the very nature of the issue, that it was an issue capable of being raised again by a defendant in any criminal case to come before this Court in the future[1] – and perhaps, in part, in any such case to come before the District Court of Guam as well.[2] It nevertheless consciously elected not to establish a binding rule for such cases. Perhaps the Ninth Circuit was not entirely satisfied with its own reasoning. Perhaps, before taking a binding stand on the issue, it wanted to wait for a case in which the issue had been more fully developed at the

---

[1] It may well be available in any civil case as well, a point on which Defendant expresses no opinion.

[2] Defendant's argument that the historic exemption of Article IV courts from the requirements of Article III should not be understood or applied categorically, but rather only with reference to the characteristics of the particular court at issue, is available in the District Court of Guam, but might be resolved differently, given the less formally permanent nature of the United States' connection with Guam. Defendant's argument that the court is not an Article IV court at all would not be available on Guam, which has a long history as an Article IV territory.

district court level.[3] Whatever the reason, the fact is that, if the Ninth Circuit had wanted this Court's future decisions to be governed by Sun, it could and would have published the decision. Indeed, if *the Government* had wanted this Court's future decisions to be governed by Sun, it could have moved to publish. *See* Ninth Circuit Rule 36-4.[4] Neither of these things occurred. Sun thus poses no bar to a full consideration of the merits of this issue; indeed, its unpublished status constitutes an open invitation to such consideration.[5]

## II. UNCONSTITUTIONAL CHARGES

Defendant Tang also argued in her motion that the charges against her must be dismissed on the ground that they all depend on the "sham marriage" doctrine – an attempt to impose a uniform and normative federal definition of marriage, contrary to the general recognition of limited-purpose marriages by the states – which violates due process in light of United States v. Windsor, __ U.S. __, 133 S.Ct. 2675 (2013). *See generally* Motion to Dismiss (ECF No. 21) at 3-6. The government offers a variety of arguments in response, all of which make the same basic point that Windsor did not overrule Lutwak v. United States, 344 U.S. 604 (1953), the case that originated the "sham marriage" doctrine. *See generally* Opposition (ECF No. 25) at 2-5.

---

[3] In Sun, the issue was raised for the first time on appeal.

[4] Nor is it significant that the Supreme Court denied the writ of certiorari in Sun. The Supreme Court is quite clear that denials of certiorari should not be taken as any comment on the merits of the case. *See, e.g.*, United States v. Carver, 260 U.S. 482, 490 (1923) ("The denial of writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times.").

[5] Non-precedential cases, while not binding, can of course be persuasive. But the Government, to its credit, does not claim that Sun is persuasive. It is not, as it contains nothing that refutes, or even addresses, any of the points made in the Motion to Dismiss.

It is true that Windsor did not overrule Lutwak, because, as the Government notes, "the two cases took up utterly distinct issues." Opposition at 3. The important distinction between the two, however, is not the one that the Government claims. It is, rather, that Lutwak was a case of statutory construction, and Windsor one of constitutionality. Windsor did not hold that the construction established in Lutwak was wrong, as an overruling case would have done. Windsor did, however, establish a constitutional rule which that construction cannot survive.

Lutwak construed the term "spouse" in the War Brides Act of 1945, former 8 U.S.C. § 232, as follows:

> The common understanding of a marriage, which Congress must have had in mind when it made provision for "alien spouses" in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations.

Lutwak, *supra*, 344 U.S. at 611.[6] That single sentence, whatever one thinks of it as a matter of logic, is the entire foundation of the "sham marriage" doctrine. Since this case obviously does not implicate the War Brides Act (which expired of it own force in 1948, years before the Defendants in this case were even born), the application of the doctrine *in this case* rests on the assumption that the same construction is to be given the term "spouse" in 8 U.S.C. § 1151(b)(2)(A)(i) (defining "immediate relatives" of citizens, who are eligible for permanent residency,[7] to include "spouses"). And Lutwak has indeed been interpreted as lying down a rule of construction for the term "spouse" (and related terms such as "marriage" or "married") wherever such terms occur in federal law. *See, e.g.*, United States v. Sacco, 428 F.2d 264, 270-

---

6 *See also generally id.* at 606 (quoting the applicable language of the War Brides Act).

7 *See* 8 U.S.C. § 1154(a)(1)(A)(i).

71 (9th Cir. 1970) (acknowledging that it was construing a different statute from the one in Lutwak, but applying the same construction notwithstanding). This construction is applied to the immigration laws, but its reach is not limited to such laws, and has never been held to depend on any peculiar power of Congress over the subject of immigration.[8] Nor is it limited to marriages entered into for the purpose of obtaining immigration status, but to limited-purpose marriages generally. *See* Sacco, *supra*, 428 F.2d at 270-71 (denying effect to marriage entered into for purpose of legitimating a child). The effect of Lutwak is thus to add the implicit additional sentence to the United States Code: "The word 'spouse,' when used by Congress, refers only to persons who intend to establish a life together." *See* Sacco, *supra*, 428 F.2d at 270 ("We conclude that the effect of Lutwak is to add to the requirement that the marriage be valid where performed an additional, federal, requirement that the parties must have intended that the marriage be one falling within the Court's definition of the common understanding of marriage.").[9]

---

[8] For example, the same rule was extended in Lutwak itself to the evidentiary laws concerning spousal testimony, *see* Lutwak, *supra*, 344 U.S. at 614-15, and Lutwak is thus as rightly considered an evidence case as an immigration case. Its rule has also been applied to, for example, the law of military benefits (*see, e.g.*, United States v. Bolden, 23 M.J. 852 (USAFCMR 1987)), while its flip side, "sham divorce," has been applied in the tax law (*see generally* cases cited in footnote 10 of the Motion to Dismiss). It amounts to a general principle, applicable to federal statutes generally, that "[a] sham marriage, void under the law of this country as against public policy, can have no validity." United States v. Lutwak, 195 F.3d 748, 753 (7th Cir. 1952), *aff'd* 344 U.S. 604 (1953).

[9] There is one important qualification, however. It is not applied where Congress has made other specific provision regarding the marriages it will recognize for purposes of the statute at issue. *See, e.g.*, United States v. Dedman, 527 F.3d 577, 585 fn.1 (6th Cir. 2008) (refusing to read "good faith" requirement by implication into spousal qualification for veteran survivor benefits, where Congress had already acted to deter "sham marriages" by requiring at least one year of marriage prior to the death of the veteran); Eisenhauer v. Mathews, 535 F.2d 681, 684-86 (2nd Cir. 1976) (imposing no good faith requirement regarding marriage in a section of the Social Security Act, where Congress had made none explicit, when it had done so explicitly in other sections of the same Act).

Even if Lutwak was correct in its construction of the term "spouses" in the War Brides Act, and even if it is also correct to impose the same construction the same term wherever else it appears without qualification in federal law, including in 8 U.S.C. § 1151(b)(2)(A)(i), that would not mean that the term, so construed, passes constitutional muster. The distinct character of these two inquiries – statutory construction and constitutionality – is illustrated by Adams v. Howerton, 673 F.2d 1036 (9th Cir. 1982), an early same-sex marriage case in which a male citizen married a male alien in Colorado, then petitioned for permanent residency. The Court noted:

> Two questions are presented in this appeal: first, whether a citizen's spouse within the meaning of [8 U.S.C. § 1151(b)] must be an individual of the opposite sex; and second, whether the statute, if so interpreted, is constitutional.

---

If that approach were applied to the statute in this case, the Lutwak rule would not apply, since the Immigration and Nationality Act does make specific provisions for marriage recognition for permanent residency purposes, but only in limited contexts not implicated in this case. The Act expressly excludes from eligibility for permanent residency spouses who "entered into [a marriage] for the purpose of procuring an alien's admission as an immigrant" in the case of "a marriage which was entered into *less than 24 months before the date the alien obtains [permanent resident] status*." 8 U.S.C. §§ 1186a(b)(1)(A)(i), 1186a(h)(1) (emphasis added). There are also express requirements of "good faith" and "bona fide" marriage for alien self-petitions under the Violence Against Women Act (VAWA). *See, e.g.*, 8 U.S.C. § 1154(a)(1)(A)(iii)(I)(aa). Outside those contexts, however, eligibility is left to hinge entirely on the facially unqualified term "spouse" – meaning, under the approach of Dedman and Eisenhauer, that the 2-year duration of the marriage, coupled with the citizen spouse's willingness to petition, is itself a sufficient guarantee of the "good faith" of the marriage, such that no individualized inquiry into the subject is either necessary or proper.

This case does not involve a VAWA self-petition, as the citizen spouse is alleged in the Indictment to have filed an I-130 petition for the alien spouse. *See* Indictment (ECF No. 4) at 4. Nor was it a petition capable of being granted within two years' of the marriage, since the petition was not even signed until more than two years after. *See id.* at 3 (parties married September 3, 2009; petitions executed September 28, 2011). Thus, under the Dedman approach, there is no statutory good faith requirement for this marriage, forming a separate and independently sufficient basis for dismissal of the Indictment.

*Id.* at 1038. Adams answered the first question in the same manner that Lutwak applied to the question of limited-purpose marriage – with a "common understanding of marriage" approach. *See id.* at 1040 ("The term 'marriage' ordinarily contemplates a relationship between a man and a woman. The term 'spouse' commonly refers to one of the parties in a marital relationship so defined.") (citations omitted).[10] It then answered the second question in the affirmative, but on a basis that is no longer tenable after Windsor – *i.e.*, by holding that there was a constitutionally sufficient "rational basis" for the distinction. *See id.* at 1041-43. In the context of limited-purpose marriage, by contrast, Lutwak addressed only the first of these two questions. The constitutional issue was neither posed by the parties nor ruled on by the Court. Thus, Lutwak, far from resolving the constitutional issue, only serves to tee up that issue for future resolution. And after Windsor, that resolution must depend on the question of whether the "additional, federal, requirement" imposed by Lutwak is any more constitutional than the similar "additional, federal, requirement" imposed by construction in Adams, and by positive enactment in the Defense of Marriage Act, that, "[i]n determining the meaning of any Act of Congress . . . the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." *See* 1 U.S.C. § 7 (DOMA).

It is not. There is no principled basis upon which a categorical federal refusal to recognize limited-purpose marriage can be distinguished from a categorical federal refusal to recognize same-sex marriage, and thus no basis on which to reach a different result in this case from that reached in Windsor. In both cases, the subject regulated is one ordinarily within the province of the states. Indeed, it is the same subject – marriage. In both cases, "[t]he avowed

---

[10] The Court thus effectively wrote DOMA into the law even before Congress imposed the same construction by statute.

purpose and practical effect of the law . . . are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex [or limited-purpose] marriages made lawful by the unquestioned authority of the States," to deny the "equal dignity" of such marriages, and to treat them "as second-class marriages for purposes of federal law." Windsor, *supra*, 133 S.Ct. at 2693-94. There can be no question that this was the purpose and effect of the construction attributed to Congress in Lutwak. *See* Lutwak, *supra*, 344 U.S. at 609 ("spurious, phony marriages"); *id*. at 611 ("fake marriages"); *id*. at 613 ("the so-called wives of these spurious marriages"); *id*. ("these so-called marriages"); *id*. at 615 ("these ostensible wives [and] their ostensible husbands"); *id*. ("a hollow mockery"); *id*. ("a sham, phony, empty ceremony"). The same can therefore be said in this case as the Supreme Court said in Windsor:

> By this dynamic [the Lutwak construction] undermines both the public and private significance of [limited-purpose] marriages; for it tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition. This places [limited-purpose] couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, and whose relationship the State has sought to dignify.

Windsor, *supra*, 133 S.Ct. 2694.

This case and Windsor are not distinguished by the fact that the Supreme Court in Windsor referred favorably to 8 U.S.C. §§ 1186a(b)(1). *See* Windsor, *supra*, 133 S.Ct. at 2690. *Cf*. Opposition at 2. As noted in footnote 9 above, that section of law pertains only to the screening process for marriages of less than two years' duration; it is thus distinct from the far more sweeping Lutwak rule, and it is not at issue in this case. Nor are they distinguished by the deferential scrutiny traditionally afforded immigration laws or laws affecting aliens. *Cf*. Opposition at 3. As noted above, the Lutwak rule is a general principle of construction not

limited to the immigration context, either by its terms or in its application; and, in the immigration context, it always involves one citizen as well as one alien. Furthermore, Windsor itself arose in the context of tax law, an area where legislative judgment is also afforded special deference,[11] but that fact did not save DOMA. And the Government concedes that Adams v. Howerton – which upheld a man-and-woman construction of "spouse" in the immigration law, based on the same "common understanding of marriage" analysis employed in Lutwak, on the authority of the same deferential immigration cases cited by the Government herein – does not survive Windsor. *See* Opposition at 3 & fn.5. Finally, it certainly does not distinguish the cases that no other court or litigant has yet taken Defendant's position here. *See* Opposition at 2 & fn.3. Given that Windsor was decided only six months ago, that is hardy surprising.

If anything, the distinctions between the two situations point even more clearly toward unconstitutionality in this case. For one, DOMA, whatever its faults, did not also suffer from the additional fault of vagueness. Its definition of "marriage" as requiring the parties to be a man and a woman was perfectly clear. The same cannot be said of the Lutwak definition requiring an intent to "establish a life together." For another, DOMA's definition, although it conflicted with state law in enough states to raise the Court's concern, was actually consistent with that in most. At the time of the decision in Windsor, only twelve states recognized same-sex marriage. *See* Windsor, *supra*, 133 S.Ct. at 2689. Limited purpose marriages, by contrast (what Lutwak,

---

[11] *See, e.g.*, Madden v. Kentucky, 309 U.S. 83, 88 (1940) ("[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification."); Regan v. Taxation with Representation of Washington, 461 U.S. 540, 547 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes.").

typically, referred to as "so-called limited purpose marriages" (*see* Lutwak, *supra*, 344 U.S. at 612)) are generally recognized as valid by the states.[12]

## CONCLUSION

For all the reasons set forth herein, and in the Motion to Dismiss, the Indictment in this case must be dismissed.

Respectfully submitted this 6th day of January, 2014.

O'CONNOR BERMAN DOTTS & BANES
Attorneys for Defendant Tang

By: /s/
Joseph E. Horey

---

[12] *See, e.g.*, Appeal of O'Rourke, 246 N.W.2d 461, 462-63 (Minn. 1976) ("[I]t appears that Leo's marriage to Kathleen may have been a 'limited purpose marriage' to facilitate her immigration from Canada. . . . However, since no Minnesota or Iowa statute declares a limited purpose marriage void ab initio . . . the trial court properly found that Kathleen's marriage was valid."); In Re Marriage of Kunz, 136 P.3d 1278, 1287 (Utah App. 2006) ("Because the legislature enumerated specific types of marriages that are void under Utah law and failed to include a sham immigration marriage among them, we construe that omission as intentional;" marriage held not void); Marble Design Intern., Inc. v. Stevens, 678 S.E.2d 276, 278-281 (Va. App. 2009) (holding "green card" marriage not void in Virginia, either under statute or on grounds of public policy); United States v. Diogo, 320 F.2d 898, 907-08 (2nd Cir. 1963) ("[T]he New York courts have repeatedly held allegedly 'sham' or 'limited purpose' marriages to be neither void nor voidable[.]"). *See generally* Annotation, 14 A.L.R.2d 624 (collecting multiple state cases holding valid marriages entered into for a variety of limited and collateral purposes, including "legitimizing child," "nullification of employment contract," and "retention of position and salary increase"). *See also* Commonwealth v. Norita, N.M.I. Super. Ct. Crim. No. 01-0304, Decision and Order Granting Motions to Dismiss Information (June 5, 2002), slip op. at 4 fn.3 ("The laws of the CNMI do not contemplate the elements of what constitutes a valid marriage beyond the civil legalities of 8 CMC §§ 1201 [parties of age and unmarried; ceremony], 1202 [license] and 1203 [ceremony; witnesses].") (copy attached).